IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-03099-MEH

BEYER LASER CENTER, LLC, and
CRAIG F. BEYER,

      Plaintiffs,

v.

MATEJ POLOMSKY,

      Defendant.

_____

## ORDER ON PLAINTIFFS' MOTION TO DISMISS
_____

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court is Plaintiffs' Motion to Dismiss Counterclaims [filed April 6, 2017; ECF No. 33]. The motion is fully briefed, and the Court finds that oral argument (not requested by the parties) will not assist in the adjudication of the motion. For the following reasons and based on the entire record herein, the Court grants in part and denies in part the Plaintiffs' motion.[1]

## BACKGROUND

      The claims in Plaintiffs' Amended Complaint derive from an ethics complaint Defendant Matej Polomsky ("Dr. Polomsky") filed with the Colorado State Medical Board ("CMB") against Plaintiff Craig F. Beyer ("Dr. Beyer"). After the Court denied in substantial part Dr. Polomsky's motion to dismiss, Dr. Polomsky filed an Answer in response to the First Amended Complaint (filed by Dr. Beyer and Plaintiff Beyer Laser Center, LLC ("BLC")) and eight Counterclaims against the

---

[1]The parties consented to this Court's jurisdiction pursuant to D.C. Colo. LCivR 40.1 on December 28, 2016. *See* ECF No. 13.

Plaintiffs.  *See* Am. Comp., ECF No. 4; Answer & Countercls., ECF No. 30.

## I.      Facts

The following are factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by the Defendant in his Counterclaims, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In 2011, Dr. Beyer advertised an ophthalmology fellowship with his company, BLC, on the website, "SFMatch."  SFMatch is sponsored by the Association of University Professors of Ophthalmology and was developed to allow fellowship applicants to visit and evaluate various training programs in a systematic fashion without the pressure of being asked for a commitment before the evaluation process is completed.  Prospective fellows rely on the information concerning the fellowship being offered by each medical practice provided by the fellowship's program director to determine which program is the best fit for the student's career goals and educational needs.

In October 2011, as part of this matching process, Dr. Polomsky spent his time and money to travel across the country to Boulder, Colorado, to learn about BLC and the fellowship advertised by Dr. Beyer. BLC was one of at least eight programs Dr. Polomsky considered for his fellowship training.  Dr. Beyer informed Dr. Polomsky that the fellowship would be a one-year anterior segment/refractive surgery fellowship program focused on training proficiency in the following areas: 1) excimer laser PRK/LASIK;[2] 2) femtosecond LASIK, Cataract, LRI's, and DALK surgery; 3) Intraocular premium IOL and Toric IOL surgery; 4) PKPs; 5) Intacts for Keratoconus; 6) Riboflavin X-linking for keratoconus; 7) ICLs for high myopia; and 8) clear lens extraction for high

---

[2]The Court notes the number of acronyms referenced, but neither identified nor explained, by the parties.  To the extent it is necessary for the Court to understand the significance of such acronyms, it will so note and strive to identify and/or explain them.

hyperopia. This was particularly exciting to Dr. Polomsky, since his primary purpose in deciding to engage in a fellowship was to learn corneal surgery and build a career as a specialist in that area.

Dr. Beyer stated that the fellow's training would be conducted by two doctors at BLC. He also stated that the fellow potentially would have the opportunity to become a partner in the practice upon successful completion of the fellowship. Relying on these statements, Dr. Polomsky chose not to pursue other opportunities available to him, accepted Plaintiffs' fellowship offer, and moved across the country to work as a fellow at BLC.

Dr. Polomsky took a year out of his life and accepted a low salary based on the promise that he would be taught the procedures Dr. Beyer stated would be covered in the fellowship. Shortly after Dr. Polomsky arrived at BLC, it became apparent to him that he had been misled regarding the nature of the "fellowship" at BLC and Dr. Beyer's intentions regarding a fellow. For example, rather than provide the broad scope of specialized training he promised, Dr. Beyer gave only limited opportunities to develop certain techniques and obtain a certain certification, and he began assigning Dr. Polomsky to perform general ophthalmology work with patients, providing little or no oversight of Dr. Polomsky's work. During this "fellowship," Dr. Polomsky was never provided any training on DSEK, DALK, PKP, intacts, vision ICLs, or femto cataract surgery. Moreover, many of the procedures as to which Dr. Beyer promised to train Dr. Polomsky were procedures Dr. Beyer did not perform himself, so there was no way Dr. Beyer could provide the training at BLC, as promised.

Despite having just hired a fellow, Dr. Beyer spent less than two days per week in the office, leaving Dr. Polomsky with little opportunity to learn the few procedures Dr. Beyer was capable of teaching him. Shortly into his fellowship, Dr. Polomsky was informed by three separate sources that Dr. Beyer was switching procedure cards, using PTK cards to perform PRK procedures. In fact, Dr.

Beyer himself mentioned using PTK cards for refractive outcomes to Dr. Polomsky. Due to his lack of personal knowledge regarding these procedures prior to his fellowship, Dr. Polomsky did not initially understand the import of this conduct.

In September 2012, Dr. Polomsky attended a conference on refractive surgery and cornea surgery in Dallas, Texas. At the conference, an expert from John Hopkins University School of Medicine taught Dr. Polomsky the intended use of PTK treatment cards including the scope of their FDA approval. When Dr. Polomsky asked this expert whether a doctor could use a PTK card to perform PRK procedures, the expert stated that even if a doctor could, in theory, use PTK cards in such a way, doing so would raise serious ethical and professional concerns.

At approximately the same time, Dr. Polomsky was shown an email written by Dr. Beyer in which Dr. Beyer discussed his intent to advertise one procedure but use less costly procedure cards intended for a therapeutic result when possible, in order to save money. Dr. Polomsky also saw the medical file of a patient in the military who had received treatment using a PTK card without his knowledge or consent, potentially putting that patient's military career in jeopardy.

When an AMO representative visited BLC in the fall 2012, Dr. Polomsky asked the representative whether it was abnormal for a doctor to use so many PTK cards if he was not performing many corneal scarring treatments. This conversation strengthened Dr. Polomsky's growing suspicion that it was not appropriate for Dr. Beyer to be using PTK cards for anything other than PTK treatments. Shortly thereafter, Dr. Polomsky became aware that a doctor could lose his medical license for switching procedure cards just to save money. Dr. Polomsky also learned that a doctor who knew of unethical conduct by another doctor and did not report it could be held just as liable as if he had engaged in the unethical conduct himself.

Although Dr. Polomsky honestly and in good faith believed that Dr. Beyer was engaging in unethical conduct by switching procedure cards, Dr. Polomsky did not want to file a report with the Colorado Medical Board. In fact, after realizing that the nature and scope of the fellowship were not as expected, and after learning of the ethical concerns regarding Dr. Beyer's medical practices, all Dr. Polomsky wanted to do was to terminate his relationship with BLC. However, Dr. Polomsky believed that his obligation as a doctor under the Colorado Medical Practice Act was to report the conduct to the Medical Board. Moreover, Dr. Polomsky believed that the only way to ensure he was not held personally responsible if there were ever any legal repercussions from Dr. Beyer's decision to switch procedure cards was to report this conduct to the Colorado Medical Board and let the Board determine whether Dr. Beyer's conduct violated the Medical Practice Act.

Dr. Polomsky believed Dr. Beyer made work at BLC so intolerable, he was forced to quit, conduct a cross-country job search seeking alternative employment, and surrender his intended career as a specialist in corneal surgery. Thereafter, Dr. Polomsky suffered a period of unemployment and/or underemployment.

On June 22, 2015, the Plaintiffs filed a lawsuit in Boulder County Court premised on the same factual predicates outlined in the present litigation (the "First Lawsuit"). The First Lawsuit was brought against two defendants, the alleged "coconspirator" identified in the present lawsuit and "John Doe." During the course of the First Lawsuit, Dr. Polomsky was deposed by Plaintiffs. The facts alleged and claims brought in the First Lawsuit were essentially the same facts and claims brought in the present litigation. In fact, nearly half of the one hundred and three paragraphs contained in the present Complaint are either identical to the allegations made in the First Lawsuit or are substantially the same, except that the name of the party has been changed from "John Doe"

or "co-conspirator" to Dr. Polomsky. Moreover, every "new" allegation in the present Complaint has been identified as a "fact" which was uncovered during the course of discovery in the prior litigation, with specific citations to evidence compiled during discovery in the First Lawsuit. The entire First Lawsuit, including all claims against "John Doe," was dismissed with prejudice on May 5, 2016. Dr. Polomsky incurred costs, including but not limited to attorney's fees, as a result of the First Lawsuit.

## II.     Procedural History

Based on these factual allegations, Dr. Polomsky asserts counterclaims for breach of contract, breach of fiduciary duty, abuse of process, malicious prosecution, fraud, violation of the Colorado Consumer Protection Act, negligent misrepresentation, and promissory estoppel. Countercls., ECF No. 30. Plaintiff seeks recovery for actual and incidental damages, costs, and attorney's fees. *Id.* at 25-26.

Plaintiffs filed the present motion arguing that Counterclaims 1, 2, 5, 7, and 8 should be dismissed pursuant to Rule 12(b)(6) because they are barred by the applicable statutes of limitation, and Counterclaims 2, 3, 4, and 6 contain only conclusory allegations and, thus, fail to state plausible claims for relief. Dr. Polomsky counters that Plaintiffs reference the incorrect Colorado statutes for their limitations provisions and argues his counterclaims are timely under Colorado's "revival" statute. In addition, Dr. Polomsky contends Plaintiffs impermissibly apply a heightened pleading standard to argue he fails to state plausible claims. Plaintiffs reply that Dr. Polomsky's "attempt to apply the revival statute . . . stretches the statute far beyond its permissible bounds." Further, Plaintiffs argue Dr. Polomsky's allegations supporting Counterclaims 2, 3, 4, and 6 are "threadbare" and "conclusory," and fail to meet the *Iqbal/Twombly* standard.

# LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 679-80. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins,* 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

The adequacy of pleadings is governed by Federal Civil Procedure Rule 8(a)(2), which requires that a complaint contain "a short and plain statement of the claim showing that the pleader

is entitled to relief." Fed. R. Civ. P. 8(a)(2). This rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations omitted). Determining whether the allegations in a complaint are "plausible" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. If the "well pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to "show[ ] that the pleader is entitled to relief" as required by Rule 8(a)(2). *Id.*

## ANALYSIS

The Plaintiffs raise essentially two challenges to Dr. Polomsky's counterclaims: they are time-barred and/or they fail to state a claim. The Court will address each challenge in turn.

## I. Statute of Limitations

Plaintiffs contend at the outset that Colo. Rev. Stat. § 13-80-109, commonly referenced as the "revival statute," does not apply to "save" Dr. Polomsky's otherwise untimely counterclaims 1, 2, 5, 7, and 8. The doctor counters that the statute does apply; in so doing, Dr. Polomsky does not appear to assert that his counterclaims are otherwise timely. Thus, the question before this Court is whether Section 13-80-109 applies to render counterclaims 1, 2, 5, 7, and 8 timely.

The "revival" statute provides in full:

> Except for causes of action arising out of the transaction or occurrence which is the subject matter of the opposing party's claim, the limitation provisions of this article shall apply to the case of any debt, contract, obligation, injury, or liability alleged by a defending party as a counterclaim or setoff. A counterclaim or setoff arising out of the transaction or occurrence which is the subject matter of the opposing party's claim shall be commenced within one year after service of the complaint by the opposing party and not thereafter.

Colo. Rev. Stat. § 13-80-109. The statute's language—requiring that the counterclaim "aris[e] out of the transaction or occurrence which is the subject matter of the opposing party's claim"—tracks Colorado's "compulsory counterclaim" rule (Colo. R. Civ. P. 13(a)) and, thus, revival turns on whether the counterclaim was a compulsory one. *Plains Metro. Dist. v. Ken-Caryl Ranch Metro. Dist.*, 250 P.3d 697, 702 (Colo. App. 2010) (citing *Skyland Metro. Dist. v. Mountain West Enter., LLC*, 184 P.3d 106, 123–24 (Colo. App. 2007)).

> A counterclaim is compulsory if it is "logically related" to the subject matter of the opposing party's claim. *Visual Factor, Inc. v. Sinclair*, 166 Colo. 22, 26, 441 P.2d 643, 645 (1968); *Dinosaur Park Investments, L.L.C. v. Tello*, 192 P.3d 513, 517 (Colo. App. 2008). Logical relationship "is a broad, flexible, and practical standard, which prevents the filing of a multiplicity of actions and encourages the resolution of all disputes arising out of a common factual matrix in a single lawsuit." *Allen* [*v. Martin*], 203 P.3d [546, 556 (Colo. App. 2008)] (internal quotations omitted). A counterclaim may be compulsory where the factual and legal issues in both it and the complaint are "offshoots" of the same controversy. *Skyland*, 184 P.3d at 124.

*Id.* "Under the plain language of the revival statute, the period to bring a stale counterclaim runs from the date of service of the first complaint that contains the claims giving rise to the compulsory counterclaims." *Makeen v. Hailey*, 381 P.3d 337, 342 (Colo. App. 2015); *see also Full Draw Prods. v. Easton Sports, Inc.*, 85 F. Supp. 2d 1001, 1009 (D. Colo. 2000) (the statute "clearly specifies that the amount of time a defendant has to file a [compulsory] counterclaim is measured with reference to the plaintiff's complaint, giving the defendant one year, but no more, to file the counterclaim.").

In this case, the Court previously set forth the following statement of factual allegations from the operative pleading in this case:

> Plaintiff Beyer and Defendant are medical doctors practicing ophthalmology and performing corrective vision surgeries. Am. Compl. ¶¶ 1–2, 5. Beyer operates his ophthalmology practice through Plaintiff Beyer Laser Center, LLC ("BLC"). *Id.* at ¶ 2. Defendant worked for BLC as a fellow from July 2012 through December 2012. *Id.* at ¶ 7; Ex. A to Am. Compl. 7, ECF No. 18. In November 2012, a former employee of BLC asked Defendant to file a false complaint with the CMB [Colorado

Medical Board]. Am. Compl. ¶ 12. Defendant and the former employee then agreed to falsely allege in CMB complaints that Beyer had been switching patients' laser vision correction treatment cards without the patients' knowledge or permission. *Id.* at ¶¶ 12, 17, 99. Before filing the complaint, Defendant did not review patient files, consult professional literature, or perform any other investigation to substantiate the allegations he made. *Id.* at ¶¶ 27–31.

Defendant and the former BLC employee entered into the conspiracy and filed their complaints with the intent to injure Plaintiffs' reputations and unfairly compete with Plaintiffs. *Id.* at ¶¶ 98–99. Additionally, Defendant filed the complaint, because he feared that he could have professional and legal exposure if he knew about unethical conduct, but failed to notify the CMB. *Id.* at ¶¶ 34–35.

The CMB initiated an investigation into Beyer's conduct and temporarily suspended Beyer's license in March 2015. *Id.* at ¶ 50. After the CMB held a hearing on Beyer's conduct, it concluded that the actions were ethical, and it reinstated Beyer's license. *Id.* at ¶ 51. As a result of Defendant's CMB complaint and the conspiracy to harm Beyer's reputation, current and prospective patients, surgeons, and service providers canceled their contracts with Plaintiffs. *Id.* at ¶¶ 88–90. This has harmed Plaintiffs' reputations and caused Plaintiffs to suffer a loss of income. *Id.* at ¶¶ 64–67.

Order, ECF No. 29 at 2-3. Plaintiffs contend the counterclaims for breach of contract, breach of fiduciary duty, fraud, negligent misrepresentation, and promissory estoppel are time-barred and cannot be revived because they are not logically related to the subject matter of the Plaintiffs' claims.

A.    Counterclaim One

For his breach of contract claim, Dr. Polomsky alleges:

50.    In 2011 Plaintiffs and Dr. Polomsky entered into a contract regarding the ophthalmology fellowship at BLC.

51.    Dr. Polomsky performed all of his obligations under that contract until Plaintiffs' actions caused Dr. Polomsky's justifiable non-performance.

52.    Plaintiffs breached the contract by, including but not limited to, failing to train Dr. Polomsky on the majority of the specialty procedures promised to be covered in the fellowship as part of the inducement to get Dr. Polomsky to accept Plaintiffs' original offer.

Am. Compl., ECF No. 4. Dr. Polomsky argues that his "knowledge and intent at the time of the November 2012 filing of the DORA complaint," which Plaintiffs concede are the only evidence necessary to prove their claims for defamation, malicious prosecution, intentional interference, and civil conspiracy based on the "single, undisputed factual predicate that Dr. Polomsky filed a statutorily mandated report with the Colorado Medical Board," gives rise to his counterclaims. Resp. 4-5. The doctor asserts, "the same facts which gave rise to the filing of Dr. Polomsky's report are the facts that give rise to Dr. Polomsky's counterclaims—namely that after Dr. Beyer intentionally induced Dr. Polomsky into accepting a fellowship with BLC through false representations regarding the nature of that fellowship, as part of his training during that fellowship Dr. Polomsky became aware that Dr. Beyer was engaging in unethical practices which required reporting under the Colorado Medical Practice Act." *Id.* at 5.

The Court disagrees that the breach of contract counterclaim is "logically related" to Plaintiffs' claims concerning Dr. Polomsky's report to the CMB. Although the applicable standard is "broad" and "flexible," any application here would contravene the requirement that the "disputes aris[e] out of a common factual matrix." *See Allen*, 203 P.3d at 556. Here, while the allegations, taken as true, demonstrate Dr. Polomsky learned of the information underlying his CMB report during his fellowship with Plaintiffs, such fact does not automatically render "compulsory" any grievance Dr. Polomsky may have arising from his employment at BLC.

Specifically, for Counterclaim One, Dr. Polomsky alleges Plaintiffs breached a contract by failing to train him "on the majority of the specialty procedures promised to be covered in the fellowship." On its face, such allegation has nothing to do with Dr. Polomsky's CMB report that Dr. Beyer "had been switching patients' laser vision correction treatment cards without the patients'

knowledge or permission" (Am. Compl. at ¶¶ 12, 17, 99), and Dr. Polomsky fails to make any argument showing a connection or relationship between the two. Furthermore, there is no argument nor indication that the CMB report contained any complaint(s) by Dr. Polomsky that his fellowship was not what the Plaintiffs had promised or that Dr. Polomsky was motivated to file the CMB report because he was dissatisfied with his fellowship experience.[3]

Therefore, the Court finds Counterclaim One—agreed by all parties to be "stale" as of the time it was alleged[4]—is not "compulsory" and, thus, it is not saved by Colorado's revival statute. The Court will dismiss Counterclaim One as time barred.

B.     Counterclaim Two

For his second counterclaim, Dr. Polomsky alleges:

_____

[3]In fact, Dr. Polomsky describes his state of mind at that time as follows:

32.     After realizing Plaintiffs' misrepresentation of the nature and scope of the fellowship and the ethical concerns regarding Dr. Beyer's medical practices, all Dr. Polomsky wanted to do was to terminate his relationship with BLC and get as far away as possible from the terrible experience his fellowship had become.

33.     However, Dr. Polomsky believed that his obligation as a doctor under the Colorado Medical Practice Act was to report the conduct to the Medical Board.

34.     Moreover, Dr. Polomsky believed that the only way to ensure he was not held personally responsible if there were ever any legal repercussions from Dr. Beyer's decision to switch procedure cards was to report this conduct to the Colorado Medical Board and let the Board determine whether Dr. Beyer's conduct violated the Medical Practice Act.

Countercls. ¶ 32.

[4]Without further argument or briefing, the Court assumes Dr. Polomsky's breach of contract counterclaim would be governed by Colorado's "general limitation of actions" statute, Colo. Rev. Stat. § 13-80-101(1)(a), which states that "all contract actions, including personal contracts" "shall be commenced within three years after the cause of action accrues." There is no argument nor indication that the counterclaim falls under the exception to this general rule, as specified in Colo. Rev. Stat. § 13-80-103.5.

55. After Plaintiffs hired Dr. Polomsky as a fellow they had a fiduciary duty toward Dr. Polomsky, as he justifiably placed trust in Plaintiffs that they would provide him the training and experience promised to him and would not act to his detriment.

56. Plaintiffs breached this fiduciary duty and abused this trust by acting in their own self-interest to the direct detriment of Dr. Polomsky.

Countercls., ECF No. 30. For the same reasons set forth above, the Court finds Counterclaim Two, concerning Plaintiffs' alleged failure to train and to provide Dr. Polomsky the fellowship experience he was "promised," is not logically related to Dr. Polomsky's report that Dr. Beyer allegedly engaged in a medically unethical practice concerning his patients. The Court will grant Plaintiffs' motion to dismiss Counterclaim Two as barred by the statute of limitations.

C.    Counterclaim Five

For his fifth counterclaim, Dr. Polomsky alleges:

74. Plaintiffs made a false representation regarding the nature and scope of the fellowship opportunity being offered at BLC.

75. The nature and scope of the fellowship was material to the parties' entire relationship.

76. Plaintiffs made this misrepresentation knowing it was false.

77. Plaintiffs misrepresented the nature and scope of the fellowship opportunity at BLC with the intent that Dr. Polomsky would rely on that misrepresentation.

78. Dr. Polomsky relied on Plaintiffs' misrepresentation and accepted the fellowship position.

79. Dr. Polomsky's reliance was justified.

80. Dr. Polomsky was actually damaged in an amount to be proven at trial by Plaintiffs' fraudulent misrepresentation regarding the nature and scope of the fellowship.

Countercls., ECF No. 30. Again, the Court finds there is no logical relationship between any alleged

false representation concerning Dr. Polomsky's fellowship with the Plaintiffs and his report to the CMB regarding Dr. Beyer's purported unethical medical practices concerning his patients. The Court will dismiss Counterclaim Five alleging "fraud"[5] against the Plaintiffs as barred by the statute of limitations.

      D.    <u>Counterclaim Seven</u>

For his seventh counterclaim, Dr. Polomsky alleges:

    87.     Plaintiffs negligently gave Dr. Polomsky false information concerning the nature and the scope of the fellowship being offered by BLC.

    88.     Dr. Polomsky reasonably relied on that false information.

Countercls., ECF No. 30. For the same reason as set forth in Section C above, the Court finds no logical relationship between this counterclaim and the Plaintiffs' claim concerning Dr. Polomsky's CMB report. The Court will dismiss Counterclaim Seven as time-barred.

      E.    <u>Counterclaim Eight</u>

For his eighth counterclaim, Dr. Polomsky alleges:

    91.     Plaintiffs made several promises to Dr. Polomsky regarding the nature and the scope of the fellowship being offered by BLC.

    92.     Plaintiffs should reasonably have expected that these promises would induce Dr. Polomsky to accept Plaintiffs' offer to receive training and perform work for BLC.

    93.     Plaintiffs should reasonably have expected that these promises would induce Dr. Polomsky to forebear from accepting alternative fellowship opportunities and/or offers of employment.

    94.     Dr. Polomsky in fact reasonably relied on the promises Plaintiffs made

---

[5]This counterclaim and the other counterclaims alleging torts are governed by Colo. Rev. Stat. § 13-80-102(1)(a), which provides that "tort actions" "must be commenced within two years after the cause of action accrues."

regarding the scope and nature of the fellowship at BLC by accepting that fellowship.

95.    Dr. Polomsky is entitled to the value of those promises made by Plaintiffs and/or Dr. Polomsky's economic, incidental, and consequential damages arising from Plaintiffs' breach of those promises.

Countercls., ECF No. 30. Again, this counterclaim involves Dr. Polomsky's concern that he did not receive what he was promised for his "fellowship" (employment) with the Plaintiffs. However, the Court finds the counterclaim is not compulsory, since the factual and legal issues in both it and the operative complaint are not "offshoots" of the same controversy. *See Skyland*, 184 P.3d at 124. The Court will dismiss Counterclaim Eight as barred by the statute of limitations.

**II.    Failure to State Plausible Claims**

Plaintiffs contend that Dr. Polomsky fails to state plausible counts for the remaining counterclaims 3, 4, and 6. The parties start their arguments with Counterclaim Six and proceed in reverse order, so the Court will do the same.

A.    Counterclaim Six

For his sixth counterclaim, Dr. Polomsky alleges a violation of the Colorado Consumer Protection Act ("CCPA") as follows:

82.    Plaintiffs engaged in an unfair and deceptive trade practice under C.R.S. § 6-1-105(1)(b), (e), (g), (i), (j), (l), (n), and/or (u) when they knowingly made false representations to patients regarding the procedures and/or procedure cards Dr. Beyer was offering, using and/or intended to use on patients.

83.    This practice occurred in the course of Plaintiffs' business, vocation, or occupation.

84.    Plaintiffs' unfair and deceptive trade practices significantly impact the public as actual or potential consumers of medical care.

85.    Dr. Polomsky suffered direct economic harm and damages to his career and professional prospects in an amount to be proven at trial as a result of these

practices.

Countercls., ECF No. 30. Plaintiffs contend these are no more than "threadbare recitals and conclusory allegations" that are insufficient to survive a motion to dismiss. Dr. Polomsky counters that his allegations, considered together and taken as true, suffice to state plausible CCPA claims against the Plaintiffs.

> The CCPA was enacted to provide prompt, economical, and readily available remedies against consumer fraud. This court has taken [a]n expansive approach ... in interpreting the CCPA by reading and considering the CCPA in its entirety and interpreting the meaning of any one section by considering the overall legislative purpose. Previously, we have stated that in determining whether conduct falls within the purview of the CCPA, it should ordinarily be assumed that the CCPA applies to the conduct. That assumption is appropriate because of the strong and sweeping remedial purposes of the CCPA.

*Crowe v. Tull*, 126 P.3d 196, 202 (Colo. 2006) (en banc) (citations and quotation marks omitted). To prove a private claim for relief under the CCPA, a plaintiff must show:

> (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.

*Id.* at 201 (quoting *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146–47 (Colo. 2003)). "[A] doctor [can] be subject to liability under the CCPA under the right conditions." *Id.* at 203 (citing *Martinez v. Lewis*, 969 P.2d 213 (Colo. 1998)). Plaintiffs challenge Dr. Polomsky's allegations supporting elements (3), (4), and (5).

Regarding the third element, the Colorado Supreme Court has found at least three factors to consider in determining whether a challenged practice impacts the public under the CCPA: "(1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and

bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted the other consumers or has the significant potential to do so in the future." *Id.* at 208. "The CCPA cannot be used to remedy a purely private wrong." *Id.*

Here, the challenged practice is alleged as, "Dr. Beyer was switching procedure cards, using PTK cards to perform PRK procedures." Countercls. ¶ 19; *see also* ¶ 34 ("the only way to ensure he was not held personally responsible if there were ever any legal repercussions from Dr. Beyer's decision to switch procedure cards was to report this conduct to the Colorado Medical Board"). Notably, Dr. Polomsky's argument centers on only the first two factors to consider. First, he contends that "[e]ven the most sophisticated consumer of medicine relies upon the licensed physicians providing their medical care for truthful and complete information concerning the medical care he will be receiving." Resp. 9. Second, Dr. Polomsky argues that Plaintiffs concede their practice has a "national reach" and involves a substantial volume of work, which demonstrates a "significant" number of consumers who could be directly affected by the challenged practice. *Id.* at 10. Moreover, regarding the third factor and whether the challenged practice has previously impacted "other" consumers or has the "significant" potential to do so in the future, the Court notes Dr. Polomsky's allegations that he "saw the medical file of a patient in the military who had received treatment using a PTK card without his knowledge or consent, potentially putting that patient's military career in jeopardy" (Countercls. ¶ 26), and he saw "an email written by Dr. Beyer in which Dr. Beyer discussed his intent to advertise one procedure but use less costly procedure cards intended for a therapeutic result when possible, in order to save money" (*Id.* ¶ 25). The Court finds Dr. Polomsky's allegations sufficient to state a plausible claim that the challenged practice "significantly impacts the public as actual or potential consumers of the defendant's goods, services,

or property."

Regarding the fourth and fifth elements, Plaintiffs argue that Dr. Polomsky's single allegation that he "suffered direct economic harm and damages to his career and professional prospects" is insufficient to satisfy the injury and causation requirements. However, Dr. Polomsky also alleges:

> 32.    After realizing Plaintiffs' misrepresentation of the nature and scope of the fellowship and the ethical concerns regarding Dr. Beyer's medical practices, all Dr. Polomsky wanted to do was to terminate his relationship with BLC and get as far away as possible from the terrible experience his fellowship had become.
>
> ***
>
> 38.    Dr. Polomsky was forced to conduct a cross-country job search in order to seek alternative employment and was required to give up on his intended career as a specialist in corneal surgery.
>
> 39.    Dr. Polomsky suffered a period of unemployment and/or underemployment as a direct result of Plaintiffs' actions.

Countercls., ECF No. 30. The Court finds these allegations are sufficient state a plausible claim that the challenged practice caused Dr. Polomsky's "period of unemployment and/or underemployment."[6]

Accordingly, the Court will deny Plaintiffs' motion to dismiss Counterclaim Six.

B.    <u>Counterclaim Four</u>

For his fourth counterclaim, Dr. Polomsky alleges:

_____

[6]The parties do not argue and, thus, the Court does not address whether a CCPA "plaintiff" must be a consumer impacted by the challenged practice. Nevertheless, because the case law differentiates between a "consumer" and a "plaintiff" in the elements required to demonstrate a CCPA claim (*see Crowe*, 126 P.3d at 201), the Court will assume for purposes of this analysis that a CCPA plaintiff need not be a consumer.

68. In the First Lawsuit, Plaintiffs knowingly filed a baseless lawsuit concerning the same facts and circumstances outlined by Plaintiffs in their Complaint in the present litigation. The First Lawsuit was brought against two alleged "coconspirators," including "John Doe," who Dr. Beyer knew or should have known was Dr. Polomsky.

69. The First Lawsuit was dismissed with prejudice on May 5, 2016, thus, resolving in favor of Defendant.

70. Dr. Beyer's statements concerning Defendant during the course of the First Lawsuit proceedings were made in bad faith and without probable cause.

71. Dr. Beyer's statements concerning Defendant during the course of these proceedings were motivated by malice toward Defendant and the alleged "coconspirator."

72. As a result of Dr. Beyer's conduct, Defendant suffered damages in an amount to be proven at trial.

Countercls., ECF No. 30. The elements of a malicious prosecution claim are: "(1) the defendant contributed to bringing a prior action against the plaintiff; (2) the prior action ended in favor of the plaintiff; (3) no probable cause; (4) malice; and (5) damages." *Thompson v. Md. Cas. Co.*, 84 P.3d 496, 503 (Colo. 2004) (en banc) (citing CJI–Civ. 4th 17:1 (1999)); *see also Hewitt v. Rice*, 119 P.3d 541, 544 (Colo. App. 2004), *aff'd*, 154 P.3d 408 (Colo. 2007). Thus, here, Dr. Polomsky must plausibly allege (1) the Plaintiffs contributed to bringing a civil or criminal proceeding against him; (2) the proceeding was resolved in favor of Dr. Polomsky; (3) there was no probable cause for the proceeding; (4) the Plaintiffs acted with malice; and (5) Dr. Polomsky incurred damages. *See id.*

Plaintiffs contend Dr. Polomsky has failed to allege the first, second, third, and fifth elements of the claim. The Court concludes that it need not engage in an analysis of each and every challenge, because it finds that Dr. Polomsky fails to allege the First Lawsuit "ended in [his] favor."

First, Dr. Polomsky does not refute that the Court may consider a copy of the state court's order from the First Lawsuit filed in Boulder County, Colorado, which is attached to the present

motion.[7]  This state court order "approves" an attached stipulation and makes it "an order of the

court."  Order, ECF No. 33-1.  The attached "Stipulation for Dismissal With Prejudice" was filed

by the Plaintiffs (also named in this lawsuit) and the Defendant Richard M. Stewart, M.D. stating

that, as a result of a mediation in which the parties engaged, the parties "agreed to resolve their

disputes and enter into a Confidential Settlement and Global Release Agreement, which has been

signed and executed by all of the Parties."  *Id.* at 2.  As the state court order is a matter of public

record, this Court may take judicial notice of its contents.  *Tal*, 453 F.3d at 1264 n.24.

Second, the Colorado Supreme Court made clear in *Hewitt*, that "a settlement does not

constitute favorable termination for purposes of a malicious prosecution claim."  154 P.3d at 415.

The Supreme Court addressed and rejected an argument, much like that proffered by Dr. Polomsky

here, that "whether a settlement amounted to a favorable termination is a question of fact for the jury

to decide," saying "It is well established that favorable termination is a question of law for the court

to decide and that a settlement is not a favorable termination."  *Id.* at 415–16.  The court reasoned,

"Relaxing the standard of favorable termination by allowing the jury to consider the facts and

circumstances underlying the parties' decision to settle a case would lower the burden of proof in

---

[7]Facts subject to judicial notice may be considered in a Rule 12(b)(6) motion without
converting the motion to dismiss into a motion for summary judgment. *Tal v. Hogan*, 453 F.3d
1244, 1264 n.24 (10th Cir. 2006).

This allows the court to "take judicial notice of its own files and records, as well
as facts which are a matter of public record." *Van Woudenberg ex rel. Foor v.
Gibson*, 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by
McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001). However, "[t]he
documents may only be considered to show their contents, not to prove the truth
of matters asserted therein." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182,
1188 (11th Cir. 2002).

*Id.*

a malicious prosecution case and deter the settlement of cases." *Id.* at 416.

Therefore, because it is undisputed that the First Lawsuit ended in a settlement of the claims, the Court finds Dr. Polomsky fails to plausibly allege a malicious prosecution claim, and the Court will dismiss Counterclaim Four.

C.     Counterclaim Three

For his third counterclaim, Dr. Polomsky alleges:

59.     In the First Lawsuit, Plaintiffs filed a lawsuit against "John Doe," who they alleged was the coconspirator in a plot to file meritless ethics complaints against Dr. Beyer with the Colorado Department of Regulatory Agencies.

60.     Upon information and belief, this lawsuit was filed for an ulterior purpose, namely to harm the reputation of one or more of Dr. Beyer's competitors in the Colorado ophthalmology community and harass individuals against whom Dr. Beyer had a personal vendetta.

61.     Dr. Beyer willfully and in bad faith used the litigation process in an improper manner.

62.     Specifically, but not by way of limitation, Dr. Beyer willfully and wantonly used the First Lawsuit in order to escalate his dispute with his alleged competitor.

63.     Dr. Polomsky, the "John Doe" in the First Lawsuit, was simply a tool used by Dr. Beyer to accomplish this purpose, as he is not, and has never been, a competitor of Dr. Beyer's in Colorado.

64.     Such purposes were not proper in the regular conduct of such proceedings.

65.     As a result of Dr. Beyer's conduct, Defendant suffered damages in an amount to be proven at trial.

66.     The damages suffered by Dr. Polomsky were attended by circumstances of fraud, malice, or willful and wanton conduct.

Countercls., ECF No. 30. "A valid abuse of process claim must allege: (1) an ulterior purpose for the use of a judicial proceeding; (2) willful action in the use of that process which is not proper in

21

the regular course of the proceedings, *i.e.*, use of a legal proceeding in an improper manner; and (3) resulting damage." *Active Release Techs., LLC v. Xtomic, LLC*, --- P.3d ---, 2017 WL 526124, at *1 (Colo. App. Feb. 9, 2017) (citations omitted). "The essential element of an abuse of process claim is the use of a legal proceeding in an improper manner; therefore, an improper use of the process must be established." *Id.* at *2 (quoting *Sterenbuch v. Goss*, 266 P.3d 428, 439 (Colo. App. 2011)). In other words, "the abuse of process tort provides a remedy in situations where litigation is properly initiated, but is misused through an irregular, generally coercive act." *Mintz v. Accident & Injury Med. Specialists, PC*, 284 P.3d 62, 66 (Colo. App. 2010), *as modified on denial of reh'g* (Feb. 24, 2011), *aff'd*, 279 P.3d 658 (Colo. 2012).[8]

Plaintiffs contend Dr. Polomsky fails to allege sufficient facts to support the first and third elements of his third counterclaim. For the first element, "an ulterior purpose is one that the legal proceeding was not designed to accomplish. *Mintz*, 284 P.3d at 66. "[T]here is no liability for abuse of process if the defendant's ulterior purpose was simply incidental to the proceeding's proper purpose." *Id.* Plaintiffs argue Dr. Polomsky's alleged "ulterior purpose"—"to harm the reputation of one or more of Dr. Beyer's competitors in the Colorado ophthalmology community and harass individuals against whom Dr. Beyer had a personal vendetta"—is simply threadbare as Dr. Polomsky fails to allege any facts supporting such allegation. Dr. Polomsky counters that his factual allegations support the required "ulterior purpose" element and the Court agrees.

Dr. Polomsky alleges that the allegations raised in the First Lawsuit against Dr. Stewart and "John Doe" are practically identical to those raised in this case, except that John Doe has been

---

[8]The Court notes the apparent inconsistency in the chronological publication of these opinions; however, the citations are correct according to www.next.westlaw.com.

identified as Dr. Polomsky. Countercls. ¶¶ 44–46. Dr. Polomsky also alleges that in the First Lawsuit the Plaintiffs alleged "'John Doe' . . . was the coconspirator in a plot to file meritless ethics complaints against Dr. Beyer with the Colorado Department of Regulatory Agencies." *Id.* ¶ 59. The doctor further alleges Dr. Beyer admitted to him he had switched the cards saying, "Dr. Beyer himself mentioned using PTK cards for refractive outcomes to Dr. Polomsky." *Id.* ¶ 20. Finally, Dr. Polomsky alleges "Plaintiffs knew or should have known that 'John Doe,' the alleged 'co-conspirator' in the First Lawsuit, was Dr. Polomsky" (*id.* ¶ 43); "Dr. Beyer willfully and wantonly used the First Lawsuit in order to escalate his dispute with his alleged competitor" (*id.* ¶ 62); and Dr. Polomsky "was simply a tool used by Dr. Beyer to accomplish this purpose, as he is not, and has never been, a competitor of Dr. Beyer's in Colorado" (*id.* ¶ 63). Taking these allegations as true, the Court finds a reasonable factfinder could conclude that Plaintiffs knew the allegations in the CMB report were true, but proceeded with the First Lawsuit and intentionally named Dr. Polomsky as "John Doe" knowing Dr. Polomsky was not a competitor, but they sought to bring a conspiracy claim against Dr. Stewart to "escalate" the dispute. As such, the Court concludes Dr. Polomsky has sufficiently pled the first and second elements of an abuse of process claim.

Regarding the third element, Plaintiffs contend that Dr. Polomsky was never a party in the First Lawsuit and, thus, "it is unclear how he could have been damaged by the First Lawsuit." Mot. 19–20.[9] Dr. Polomsky counters that he alleges he "incurred costs, including but not limited to attorney's fees, as a result of the First Lawsuit." Countercls. ¶ 48. Court costs, reasonable

---

[9] In their reply brief, Plaintiffs "rest[ed] on the arguments set forth in their Motion" concerning the malicious prosecution and abuse of process counterclaims. Reply 12-13.

attorney's fees, and other reasonable expenses may be recovered as damages for an abuse of process claim. *See Palmer v. Diaz*, 214 P.3d 546, 556 (Colo. App. 2009) (finding trial court's award of attorney's fees and costs duplicative of those considered by the jury for the abuse of process counterclaim).

The Court finds Dr. Polomsky's allegations, taken as true at this stage of the litigation, assert a plausible claim for abuse of process against the Plaintiffs. Thus, the Court will deny Plaintiffs' motion to dismiss Counterclaim Three.

## CONCLUSION

In sum, the Court finds that Dr. Polomsky failed to state plausible counterclaims for breach of contract (Counterclaim One), breach of fiduciary duty (Counterclaim Two), malicious prosecution (Counterclaim Four), fraud (Counterclaim Five), negligent misrepresentation (Counterclaim Seven), and promissory estoppel (Counterclaim Eight). However, the Court concludes Dr. Polomsky's allegations are sufficient, taken as true at this early stage, to state plausible counterclaims for abuse of process (Counterclaim Three) and a violation of the CCPA (Counterclaim Six). Accordingly, based upon the foregoing reasons, the Court **grants in part and denies in part** the Plaintiffs' Motion to Dismiss Counterclaims [filed April 6, 2017; ECF No. 33].

SO ORDERED at Denver, Colorado this 30th day of May, 2017.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge

24