IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-03099-MEH

BEYER LASER CENTER, LLC, and
CRAIG F. BEYER,

       Plaintiffs/Counterclaim Defendants,

v.

MATEJ POLOMSKY,

       Defendant/Counter Claimant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

    Before the Court is Plaintiffs Beyer Laser Center, LLC, and Craig F. Beyer's Motion for Summary Judgment (ECF 151). Plaintiffs seek summary judgment in their favor on Defendant's two remaining counterclaims: Claim 3 for abuse of process, and Claim 6 for violation of the Colorado Consumer Protection Act ("CCPA").[1] For the reasons that follow, the Motion is granted.

## FINDINGS OF FACT

    The Court makes the following findings of fact viewed in the light most favorable to Defendant, who is the non-moving party in this matter.

1.     Plaintiff Craig F. Beyer is an ophthalmologist who practices at Plaintiff Beyer Laser Center ("BLC"). ECF 150 ¶ 1; ECF 166 ¶ 1.

---

[1] As discussed more fully below, Defendant also moves for summary judgment on his CCPA claim. *See* ECF 150 at 24-35.

2.     From April to October 2012, Katherine Homan was BLC's Refractive Services Director. When a prospective patient first contacted BLC, Ms. Homan would inform the patient of the available treatment options. Among these options, she would describe the differences between "conventional" and "custom" treatments. ECF 150-10 ¶¶ 2-3.

3.     In Discussing options, Ms. Homan would use handouts that contained pricing programs and videos created by manufacturers. ECF 150-11 at 44:3–46:1.

4.     BLC also distributed material that contained the following when a patient was choosing his or her desired procedure:

> As of June 2003, the FDA approved a more expensive "customized" approach to LASIK surgery called "WavePrint" or "CustomVue." Unlike the "Traditional" treatment, "the CustomVue WavePrint refractive technology provides a WavePrint Map – a unique fingerprint of the patient's vision that displays the refractive errors and aberrations of the eye. This information is directly entered into the laser allowing an extremely precise, customized treatment for your eye.

ECF 150-5.


5.     In 2011, Dr. Beyer hired Dr. Polomsky for a fellowship at BLC, which would begin upon Dr. Polomsky's completion of his residency in the summer of 2012. ECF 150 ¶ 1; ECF 166 ¶ 1.

6.     In October 2012, Dr. Richard Stewart, another ophthalmologist at BLC, filed a complaint with the Colorado Medical Board ("CMB") accusing Dr. Beyer of obtaining patients' consent for a specific procedure and then "ultimately performing an entirely different procedure." ECF 150-20 at 5; ECF 166 ¶ 21. In the Complaint, Dr. Stewart stated that Dr. Beyer had been "substituting the PTK cards for PRK/LASIK cards and passing this off to patients as refractive surgery." ECF 150-20 at 6.

7.      In November 2012, Dr. Polomsky filed a similar complaint with the CMB.  In this document, Dr. Polomsky reported that Dr. Beyer "ha[d] been switching laser vision correction treatment cards without patients' knowledge or permission."  ECF 150-19; *see* ECF 150 ¶ 19 and ECF 166 ¶ 19.  He stated further that the "switched treatment cards were of inferior quality to what the patient asked for, had been consented for, and paid for."  ECF 150-19.

8.      On December 24, 2012, a third complaint regarding Dr. Beyer was filed anonymously with the CMB.  ECF 195 ¶ 1; ECF 201 at 2.

9.      Dr. Polomsky determined to end his fellowship at BLC "early" based on "a lot of things," including the "stress" of being "associated with Dr. Beyer," who he believed to be "committing fraud."  ECF 150-57 at 34:4–7, 35:18–25, 36:1.  Beginning August 20, 2012, Dr. Polomsky worked with a "head-hunter" and on his own to seek alternate employment; he interviewed with an ophthalmology practice in Wilmington, North Carolina in November 2012 and accepted its offer in December 2012 for a position with a starting salary of $120,000.  ECF 166-28 at 6.

10.     On March 13, 2015, the CMB suspended Dr. Beyer's license to practice medicine.  In the Order of Suspension, the CMB stated it determined it had "reasonable grounds" to conclude Dr. Beyer had "deliberately and willfully violated" ethical standards based on his practice of using PTK cards to perform PRK or Lasik procedures.  ECF 150-21 at 1-2.  The letter stated the suspension was "pending proceedings for suspension or revocation."  *Id.* at 2.  The notice informed Dr. Beyer that he "may request a hearing" before the CMB to argue "why the suspension should be set aside."  *Id.* at 3.

11. At the hearing held on April 9, 2015, the CMB "reviewed and considered new information regarding th[e] matter" and concluded the suspension "should be terminated." It thereby reinstated Dr. Beyer's license to "active and in good standing." ECF 150-22 at 1-2.

12. There is no dispute that during the relevant period, Dr. Beyer used PTK cards to perform PRK procedures. Dr. Beyer continued to do so after the CMB terminated his suspension. ECF 150-3 at 189:8–13.

13. On June 22, 2015, Plaintiffs initiated a lawsuit in Boulder County, Colorado District Court against Dr. Stewart and "John Doe" based on claims related to the suspension of Dr. Beyer's license (the "First Lawsuit"). ECF 151 ¶ 26; ECF 163 ¶ 26.

14. Plaintiffs learned during discovery in the First Lawsuit of Dr. Polomsky's CMB complaint. ECF 151 ¶ 30.[2]

15. Plaintiffs initiated this action against Dr. Polomsky on October 27, 2016, in Boulder County District Court, ECF 4. Dr. Polomsky timely removed the action to this Court, ECF 1.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome

---

[2] Dr. Polomsky purports to deny this fact, but his citations to the record do not support the denial. ECF 163 ¶ 30; *see* ECF 150-3 at 377:9–23.

of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).  Only admissible evidence may be considered when ruling on a motion for summary judgment.  *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined.  *Celotex*, 477 U.S. at 322.  That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial.  Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002).  These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'"  *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324).  "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil

Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Plaintiffs seek an order granting summary judgment as to Defendant's two remaining counterclaims for abuse of process and violation of the CCPA. The Court will address each claim in turn.

## I.     Abuse of Process[3]

Defendant asserts a claim for abuse of process based on the First Lawsuit. An abuse of process claim "provides a remedy for situations where litigation, though properly commenced, is misused to *coerce or compel* a result that couldn't normally be obtained via the ordinary use of process." *Parks v. Edward Dale Parrish LLC*, — P.3d —, 2019 WL 470515, at *2 (Colo. App. Feb. 7, 2019) (emphasis added). The elements of an abuse of process claim are:

> (1) an ulterior purpose for the use of a judicial proceeding; (2) willful action in the use of that process which is not proper in the regular course of the proceedings, i.e., use of a legal proceeding in an improper manner; and (3) resulting damage.

---

[3] In addition to the present Motion and related briefing, the Court heard limited oral argument on the issue of Defendant's abuse of process counterclaim at the September 18, 2019 Discovery Conference. At that Conference, the Court invited the parties to submit supplement written argument on Defendant's argument that two of Plaintiffs' claims are barred by statute of limitations. Those supplemental written arguments (ECF 195 and ECF 201) also contain additional arguments as to Defendant's abuse of process counterclaim. Defendant further used his Motion for Reconsideration (ECF 196) which requests the Court reconsider its order on Defendant's claim preclusion argument, as an opportunity to present the Court with additional argument as to Defendant's abuse of process claim. In ruling on the present Motion, the Court considered the limited oral arguments and supplemental written arguments in addition to the arguments made in the Motion and related briefing.

*Active Release Techniques, LLC v. Xtomic, LLC*, 413 P.3d 210, 212 (Colo. App. 2017). Plaintiffs argue that Defendant cannot present evidence establishing any of the elements.

Regarding the first element, the parties dispute the purpose of the First Lawsuit. Plaintiffs assert they filed the First Lawsuit "to recover damages caused by the false ethics complaints filed against Dr. Beyer." ECF 151 at 13. Defendant counters in his response that Plaintiffs' "primary purpose in filing and pursuing the First Lawsuit was to harm Dr. Stewart's reputation, against whom Dr. Beyer had a personal vendetta . . . ." ECF 163 at 13. Defendant provided additional arguments as to the "ulterior purpose" element during the September 18, 2019 limited oral arguments on this claim. These additional arguments include: "to obtain leverage over Dr. Stewart in [Plaintiffs'] ongoing personal vendetta against him," ECF 206 at 4; " to put pressure on Dr. Stewart by bringing baseless claims involving a third party," *id*. at 7; and "use of the process by dragging in unwarrantedly a third-party into the proceedings in order to exacerbate the dispute," *id*. at 9, with Dr. Stewart. In general, Defendant's abuse of process ulterior purpose argument is that Plaintiffs added claims against a John Doe co-conspirator to gain leverage over and put pressure on *Dr. Stewart* by the mere fact that there was an additional claim, namely civil conspiracy, at issue in the First Lawsuit.

Given these arguments, the Court fails to see how the Defendant has standing to bring his claim for abuse of process. When the Court asked during the limited oral arguments if there was standing to bring the claim, Defendant relied on *American Guarantee & Liability Insurance Company v. King*, 97 P.3d 161 (Colo. App. 2003). In *American Guarantee*, an insurance company filed a subrogation lawsuit against a wife, after being told it likely did not have subrogation rights in the case, in order to put pressure on and obtain money from her husband. *Id.* The Colorado

Court of Appeals held that the trial court did not err in finding that the claims filed against the wife constituted abuse of process. *Id*. at 170.

Defendant in this case asserts that what happened in the First Lawsuit is "absolutely what happened in *American Guarantee*," ECF 206 at 9; the Court disagrees. In *American Guarantee*, the wife was named as a party in a lawsuit, and claims were filed against her. Her claims would, in turn, put pressure on her husband based on their spousal relationship. Defendant here argued that in the First Lawsuit Dr. Polomsky, who Plaintiffs suspected could be the "John Doe" with whom Dr. Stewart conspired, "for all intents and purposes" was exactly like the wife in *American Guarantee*. *Id*. at 5. Unlike the wife, however, Dr. Polomsky was never named as a party in the First Lawsuit. Even if Dr. Polomsky had affirmatively been named as a party in the first lawsuit, doing so would not have created the same pressure as in *American Guarantee*. The pressure in that case was created by the spousal relationship of the husband and wife. As examined below, the mere fact that an additional claim puts additional pressure on parties in litigation is an ancillary effect of litigating and is not an ulterior purpose that supports an abuse of process claim.

Assuming Defendant does have standing to bring an abuse of process claim in this case, the Court finds Defendant fails to demonstrate a material factual dispute as the ulterior purpose element of the claim. The Restatement (Second) of Torts provides, in pertinent part:

> [T]here is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant. Thus, the entirely justified prosecution of another on a criminal charge, does not become abuse of process merely because the instigator dislikes the accused…nor does the instigation of justified bankruptcy proceedings become abuse of process merely because the instigator hopes to derive benefit from the closing down of the business of a competitor.

Restatement (Second) of Torts § 682 cmt. b. (1977). As noted above, Defendant argues that the unlawful purpose of the First Lawsuit was to "put pressure on" Dr. Stewart by adding additional

claims against him. However, the fact that additional claims make a lawsuit larger and more difficult to defend is merely an ancillary effect of the realities of litigation that, although possibly enjoyed by Plaintiffs in that case, would not turn a justified claim into abuse of process. Defendant alleges that Plaintiffs' assertions that the primary purpose of the First Lawsuit was "to recover damages caused by the false ethics complaints filed against Dr. Beyer," ECF 151 at 13, "are directly contradicted by the evidence in this case." ECF 163 at 13. However, to support this statement Defendant cites to only a single "Additional Material Uncontroverted Fact" from his Response which Plaintiffs proceed to dispute in their reply. *Id.*; ECF 171 at 3. Defendant provides no other specific evidence to support the contention that the lawsuit was filed for an improper purpose other than making that inference from the mere fact a lawsuit was filed.

The Court further finds Defendant fails to demonstrate a material factual dispute as to the second element. "[U]sing a legal proceeding in an improper manner requires proof of a willful act by the defendant in using the process that is not proper in the proceeding's regular course." *Mintz v. Accident & Injury Med. Specialists, PC*, 284 P.3d 62, 66 (Colo. App. 2010), *as modified on denial of reh'g* (Feb. 24, 2011), *aff'd sub nom. Accident & Injury Med. Specialists, P.C. v. Mintz*, 279 P.3d 658 (Colo. 2012). In other words, "the filing of a justified lawsuit cannot constitute the act necessary to sustain an abuse of process claim, even if the suit was filed for an ulterior purpose." *Id.* "The usual case of abuse of process is one of some form of *extortion*, using the process to *put pressure upon the other to compel him to pay a different debt or to take some other action* or refrain from it." Restatement (Second) of Torts § 682 cmt. b. (1977) (emphasis added). For example, the court in *Walker v. Van Laningham*, 148 P.3d 391 (Colo. App. 2006) upheld the dismissal of an abuse of process claim for a plaintiff's failure to satisfy the second element saying,

Accordingly, we conclude that, as a matter of law, filing complaints about barking dogs and cruelty to animals under the Ordinance, in the manner prescribed by those ordinances, is not an improper use of process. Even assuming the truth of the allegation that [defendants] had an ulterior motive, we conclude they took no further improper or coercive action to obtain a collateral advantage not properly included in the process itself. [Defendants'] concerns fell squarely within interests that were protected by the Ordinance. Any advantages that they may have obtained as a result of [plaintiff's] convictions for violating the Ordinance were regular and legitimate goals which the proceedings were designed to achieve.

*Id.* at 395. Notably, the *Walker* court cited cases "distinguishable" from the plaintiff's claim, in which the courts found the challenged proceedings to have been used in an improper manner, such as to accomplish a coercive goal. *Id.* at 395-96 (citing cases).

Here, Defendant has presented no evidence raising a disputed fact as to whether Plaintiffs used the First Lawsuit to coerce him to do something to the Plaintiffs' advantage that was collateral to and not properly included in the lawsuit. Instead, Defendant argues the second element is met because the Plaintiffs "[brought] 'sham' claims . . ., the intent of which was to escalate the dispute between [Plaintiffs] and Dr. Stewart, which had been ongoing . . . since Dr. Stewart refused to join [Plaintiffs'] practice at the end of 2012." Resp. 14.[4] However, even if it is true that Plaintiffs

---

[4] To support this argument, Defendant cites to three cases: *Technical Computer Services, Inc. v. Buckley*, 844 P.2d 1249 (Colo. App. 1992); *Concerned Members of Intermountain Rural Electric Association v. District Court, Jefferson County*, 713 P.2d 923 (Colo. 1986); and *Protect Our Mountain Environment, Inc. v. District Court In and For Jefferson County* ("*POME*"), 677 P.2d 1361 (Colo. 1984). But his argument, and the Colorado Supreme Court cases to which he cites, pertain to an entirely distinct legal principle which does not apply here: the *Noerr–Pennington* doctrine.

In *POME*, the Colorado Supreme Court recognized that "[t]he First Amendment right to petition has been applied to immunize various forms of administrative and judicial petitioning activity from legal liability in subsequent litigation." 677 P.2d at 1365. Thus, for example, a party who uses the courts to oppose government action would be protected from abuse of process claims in subsequent litigation. *Id.* However, this protection has its limits; the *Noerr–Pennington* "sham exception" allows a party to sue for abuse of process based on a previous lawsuit that was filed for the purpose of petitioning the government, if the party can show the lawsuit was "baseless" and "the petitioning activity was conducted primarily for harassment or other improper purpose." *Id.* at 1367; *see also Concerned Members*, 713 P.2d at 924.

Recently, the Colorado Supreme Court addressed whether the standards set forth in *POME* and its progeny, including the *Noerr-Pennington* doctrine, apply to "purely private disputes." *Boyer v. Health Grades, Inc.*, 359 P.3d 25, 26 (Colo. 2015). In *Boyer*, the plaintiff corporation brought various claims against two former employees alleged to have engaged in "competition" with and "solicitation" from the employer; the employees asserted a counterclaim for abuse of process alleging the employer's claims were a "sham." *Id.* The court reversed the trial court's and appellate court's application of *POME* and its progeny to the counterclaim, saying:

intended to escalate a dispute by bringing meritless claims in the First Lawsuit, this, itself, is insufficient to meet the second element of Defendant's abuse of process claim, absent some evidence that Plaintiffs used the lawsuit to obtain an advantage not properly included in the process. *Mintz*, 284 P.3d at 66; *Walker*, 148 P.3d at 395.

In addition to arguing the filing of "sham" claims is the basis for his abuse of process claim, Defendant also argued during the September 18, 2019 Conference that, because "process" includes any judicial process, subpoenaing and deposing Dr. Polomsky during the First Lawsuit was also a basis for his abuse of process claim. Defendant claimed that fact discovery in the First Lawsuit confirmed Dr. Stewart to be the author of the anonymous December 2012 CMB complaint before Dr. Polomsky was deposed. Defendant continues that subpoenaing somebody "who has nothing to provide" on the dispute and deposing him was an abuse of process. However, regardless of whether Dr. Polomsky was or was not "John Doe," Dr. Polomsky worked at Plaintiff BLC during the time when the events underlying the First Lawsuit occurred. Dr. Polomsky, therefore, would have still been a relevant fact witness such that taking in his deposition would have been "properly included in the process" of the First Lawsuit. Taking Dr. Polomsky's deposition was not a willful act "not proper in the proceeding's regular course." *Mintz*, 284 P.3d at 66. Because Defendant fails to demonstrate a material factual issue as to whether the First Lawsuit was used "to coerce or

We believe there are strong policy reasons for continuing to provide protection against the resort to judicial or administrative process for improper purposes, whether or not the claims at issue have some objective justification. We also believe that a distinction between the resort to legal process implicating purely private disputes and the resort to legal process implicating matters of public concern is one that comports with Supreme Court usage. Therefore, unless and until our understanding of controlling Supreme Court jurisprudence is proven wrong, **we find the heightened standards we articulated in *POME*, reflecting the sham exception of the *Noerr–Pennington* doctrine, to be inapplicable to a resort to administrative or judicial process implicating purely private disputes**.

*Id.* at 29 (emphasis added).

compel a result that couldn't normally be obtained via the ordinary use of process," *Parks*, 2019 WL 470515, at *2, summary judgment is warranted.

Accordingly, the Court concludes that Defendant has failed to present evidence showing a genuine factual issue as to two elements of his abuse of process claim, thus, summary judgment in favor of the Plaintiffs is proper.

## II.    CCPA Claim

The Parties have filed cross motions for summary judgment on Defendant's counterclaim for violation of the CCPA.  To recover under the CCPA claim, Defendant must demonstrate:

> (1) the Plaintiffs engaged in an unfair or deceptive trade practice;
> (2) the challenged practice occurred in the course of Plaintiffs' business, vocation, or occupation;
> (3) it significantly impacts the public as actual or potential consumers of the Plaintiffs' goods, services, or property;
> (4) the Defendant suffered injury in fact to a legally protected interest; and
> (5) the challenged practice caused the Defendant's injury.

*See Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003).  Plaintiffs argue Defendant cannot establish elements 1, 3, 4, and 5.  The Court finds that, even assuming Defendant meets his burden regarding the other requirements, Defendant has not presented genuine issues of material fact as to the third and fifth elements.

First, the Colorado Supreme Court has instructed that courts should consider at least three factors in determining whether a challenged practice impacts the public under the CCPA:

> (1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future.

*Crowe v. Tull*, 126 P.3d 196, 208 (Colo. 2006) (quoting *Rhino Linings*, 62 P.3d at 149).

Defendant's theory of liability is this: that Plaintiffs enticed patients to choose more expensive treatments, then used a less expensive means/method to perform the treatments. In other words, Plaintiffs' customers were promised—and paid for—a "custom" or "premium" treatment, but they actually received a "regular" treatment.

This case is unlike *Crowe* and other similar cases where the alleged misrepresentations were found in public statements or advertisements. Here, the alleged misrepresentations (or omissions, depending on the perspective) are found in each transaction between doctor and patient. That is, Defendant does not contend that Plaintiffs' advertisements regarding the "premium" treatments, including videos, brochures, and even the BLC Director's marketing efforts, were false; rather, the alleged "deceptive practice" occurred once a customer chose a premium treatment and Dr. Beyer then used an alleged "inferior" method in applying the treatment. *See Crowe*, 126 P.3d at 204 ("The crux of a CCPA claim is a deceptive trade practice, which, by definition, must be intentionally inflicted on the consumer public."); *Brodeur v. Am. Home Assur. Co*., 169 P.3d 139, 155–56 (Colo. 2007) ("Under the CCPA, it is not enough that the defendant's industry affects the public interest. . . . As we have emphasized before, to constitute the public impact contemplated by the CCPA, the challenged *practice* must significantly impact the public."). While such practice might support a tort (or even contract) claim against the doctor by the patient, it does not demonstrate a practice that "significantly impacts the public," particularly where, as here, Defendant cites to only six patients who allegedly chose a "custom" treatment, but received that treatment by inferior means.[5] *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62

---

[5] Defendant's reference to 137 patient records allegedly reflecting that a PTK card was used for a PRK or Lasik procedure do not establish a genuine issue of material fact as to whether these patients were victims of a deceptive trade practice. See Ex. FFF, ECF 150-58. More importantly, as discussed below, there is no indication from these records that the patients were negatively impacted by any deceptive trade practice.

P.3d 142, 150 (Colo. 2003) (three affected dealers out of approximately 550 worldwide did not significantly affect the public).

Moreover, the CCPA's stated purpose demonstrates that the term, "significant impact," within the context of a CCPA claim must have a negative connotation and, therefore, a claimant must demonstrate the deceptive practice not only "significantly," but "negatively," impacts the public. *See Crowe*, 126 P.3d at 208 ("The CCPA 'was enacted to regulate commercial activities and practices which, "because of their nature, may prove injurious, offensive, or dangerous to the public."'"). In this case, the record is devoid of any evidence that the alleged deceptive practice negatively impacted Plaintiffs' customers, and Defendant fails to raise a material factual issue as to whether the practice would negatively impact the public.

Finally, Defendant asserts that the injury he suffered as a result of Plaintiffs' alleged deceptive practice(s) was that he was "stymied" in his efforts to "build[ ] his professional practice and its value." ECF 150 at 34. However, the only evidence Defendant cites (to demonstrate a genuine issue of material fact as to whether his injury was caused by Dr. Beyer's deceptive practice) is his own testimony in which he attests that he suffered "stress" from being associated with Dr. Beyer against whom a patient could potentially file a "malpractice lawsuit." *Id.* at 35 (citing Ex. EEE, 35:18–36:7). Defendant also mentions his "reputation," but he refers to "now" being "dragged into this" and "having to explain to my fellow colleagues that I'm involved in this situation where my senior mentor was committing fraud and being sucked into this lawsuit." Ex. EEE, 36:2–7. Nothing in this testimony reflects that Defendant has been hindered in his ability to build his profession because of Dr. Beyer's alleged deceptive trade practice. Defendant neither testifies about nor points to evidence showing that he was or has been unemployed or

underemployed; in fact, while searching for employment in late 2012, Defendant was offered three positions as an ophthalmologist and accepted one of the positions in Wilmington, North Carolina. ECF 166-28 at 6-7. Rather, Defendant makes clear that any harm he perceives to his reputation has come from his involvement in the lawsuit. The Court finds Defendant has failed to demonstrate a genuine issue of material fact as to the fifth element.[6]

Accordingly, the Court concludes that Defendant has failed to present evidence showing a genuine factual issue as to whether the Plaintiffs violated the CCPA and, thus, summary judgment in favor of the Plaintiffs is proper.

## CONCLUSION

Defendant has raised no genuine disputes of material fact as to whether Plaintiffs have abused the legal process or violated the CCPA. Therefore, Plaintiffs' Motion for Summary Judgment [filed May 13, 2019; ECF 151] is **granted**.

SO ORDERED.

Entered and dated at Denver, Colorado, this 25th day of October, 2019.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge

---

[6] Defendant testified that a different "other stress" or "non-economic damage" he suffered was the lost opportunity to be a "corneal specialist," for which he "had his hopes up." ECF 150-57 at 36: 11-21. However, Defendant did not explain during his deposition nor in his briefing here how the inability to be a corneal specialist might have injured his reputation or profession.